DAVID O. WATKINS, Banking and Insurance Commissioner,

*v.*

COMMONWEALTH SAVINGS AND LOAN ASSOCIATION.

[Decided October 8th, 1906.]

1. The claims of general creditors of an insolvent building and loan association are entitled to priority of payment from the assets over the claims of shareholders as such.

2. In the distribution of the assets of an insolvent building and loan association among the shareholders, a certain class of shareholders *held* to be entitled to priority of payment.

---

Heard on appeal from the decision of a receiver refusing to allow the claim upon the part of certain shareholders to participation in the distribution of the assets of an insolvent building and loan association.

*Mr. Francis D. Weaver,* for the appellant.

*Mr. William Early,* for the receiver.

LEAMING, V. C.

The Commonwealth Savings and Loan Association was incorporated in the year 1901, under the Building and Loan Association statutes of this state. Becoming insolvent, a receiver has been appointed by this court, and the question now presented is the determination of the relative status, as to priority, of the claims of two classes of its stockholders. It is not represented

to the court that any creditors exist other than the stockholder creditors now under discussion. If any general creditors exist, that is, any creditors other than those whose claims are based on their rights as holders of stock, such creditors are manifestly entitled to priority of payment out of the assets, before any of the stockholders can participate in a distribution of the assets. This rule is well established and applies to building and loan associations the same as to trading corporations.

The relative rights of the two classes of stockholders now in question must be determined by the philosophy of the general scheme as disclosed by the charter and by-laws. No course of dealing has been disclosed by the evidence to suggest other equities.

By the charter two classes of stock are authorized, one called "founders' stock" and the other "general or common shares;" the former to be divided into forty shares of the par value of $50 each, and the other into four thousand nine hundred and eighty shares of the par value of $100 each. The seven incorporators subscribed for the entire forty shares of "founders' stock" by the certificate of incorporation and paid into the treasury of the company, in cash, the full amount of their subscriptions. This fund is referred to in the charter as the capital with which the association will commence business. The common stock to be issued after the company commenced business consisted of three classes, called, respectively, installment, prepaid and permanent shares. The installment stock called for monthly payments until the stock should "mature" by reaching a value of $100. This was estimated in the by-laws to occur in seventy-two months, when paid in at one dollar per month, and in one hundred and twenty months, when paid in at fifty cents per month. The prepaid stock was sold at $70 per share, payable in advance, and the permanent stock at $75 per share, payable in advance. Both the prepaid and permanent stock were by the by-laws guaranteed six per cent. cash dividends, payable semi-annually, and both participated in the earnings by having not more than four per cent., annually, carried to their credit to mature them.

The important provisions of the charter and by-laws touching the question here involved were as follows:

The charter provided:

"*Fifth.* That this association is hereby incorporated under and by virtue of the provisions of an act designated as the Mutual Loan and Building Association act of February 28th, 1849, the act of February 28th, 1852, and of the revised statute approved April 9th, 1875, known and designated as 'An act to encourage the establishment of mutual loan and homestead and building associations,' and of the act of March 21st, 1888, and the supplements and amendments thereto.

"*Sixth.* That the parties who sign this certificate of incorporation are the original associates or founders who have formed themselves into the Commonwealth Savings and Loan Association under the acts for the creation of mutual loan and building associations and their supplements, and have actually created the fund of two thousand dollars ($2,000) to be expended for the expenses and needs of the association, and in acquiring lands and tenements, and said original associates or founders and their assigns alone shall be deemed to have and exercise the rights of members in said association, as provided in section 11 of the revised statute of April 9th, 1875, and the voting privileges for directors as hereinafter provided, and the said members of said original association and their assigns shall be entitled to all the benefits, profits, rights and interest in said Commonwealth Savings and Loan Association, and the assets thereof, after the payment to the subsequent subscribers to the stock of said association of at least six per centum of the cash payments from the time of payment to said association's stock in addition to their stock payments, and their share of any surplus as may be provided by law, or, in the absence thereof, by the by-laws of the association.

"That said association is formed for the benefit of the incorporators and their successors and assigns who sign this certificate, to whom is allotted original associates' or founders' shares, fully paid, and also for all others who afterwards become members, their successors and assigns, subject to the rights of said original associates or founders, as hereinafter provided.

"*Seventh.* The total authorized capital stock of this corporation is five hundred thousand dollars ($500,000), divided into forty shares of the par value of fifty dollars ($50) each, which said forty shares shall be known and designated as original associates' or founders' shares, and four thousand nine hundred and eighty shares (4,980) of the par value of one hundred dollars ($100) each, which shall be known and designated as general or common shares. That the forty shares so issued to the original associates constituting the original associates' or founders' fund shall not be deemed a liability of said Commonwealth Savings and Loan Association, except at the time and upon a dissolution of the business of said association, or upon a final termination of its affairs, but shall confer on the contributors, to said fund, and their successors and assigns, ratably and in proportion to the amount contributed, all the right and privileges following; that is to say—

"(*a*) All the profits, rights, benefits and interest in said Commonwealth Savings and Loan Association and the assets thereof after the payment to the subsequent subscribers to the common stock as hereinbefore particularly provided in clause 6 of these articles of incorporation."

The by-laws provide:

"SEC. 2. The nature of the business of this corporation shall be that of a savings and loan association, its object being to provide a method by which its members may deposit small sums of money monthly, at a good earning rate, or invest larger sums and receive cash dividends thereon, and to loan money to its members to cancel real estate mortgages, and to purchase homes on an easy monthly-payment plan.

"SEC. 4.  *  *  *  The stock of the association shall be divided into forty-nine hundred and eighty (4,980) shares of general stock, of the par value of $100 each, which may be paid monthly, or in advance, or in one cash payment, and forty shares of founders' stock, of $50 each, which founders' fund is paid in cash by the incorporators, and shall constitute and be part of a reserve fund account, which, with its accretions, shall be apportioned, accredited and distributed in such manner as the directors may determine, and ratably, to the owners of these shares, upon a final termination of the business, or when the total present issue has been subscribed, and shall not be a liability of the association until that time.

"SEC. 7.  *  *  *  The compensation of the officers, directors and employes shall from time to time be fixed by the board. The expenses of the company shall be drawn exclusively from the reserve fund.

"SEC. 20.  *  *  *  Membership fees, premiums, appraisal and attorney fees, and such of the profits over and above the stipulated dividends as the directors may determine, shall be placed in the reserve fund. The expense of the company shall be drawn from this fund, and the fund maintained in sufficient proportion to provide against possible contingent losses, and to serve as a guarantee of permanency and security of the investments of the association, provided that additional earnings, not to exceed four per cent. per annum for actual time of investment, may be drawn from this fund and accredited to the stock of the company, which will aid in its early maturity, and shall be withdrawable only at that time. Under no circumstances shall any deduction from the general stock payments of the company be made for running expenses or maintaining the reserve fund."

By the charter the directors were required to consist of four members to be chosen from the owners of the "founders' stock" and three from the owners of common stock.

It will be seen from the above provisions of the charter and by-laws, that the original incorporators—owners of the "founders' stock"—occupy a position in many respects similar to that occupied by the stockholders of an ordinary trading corporation. The

money paid by these founder shareholders for their shares formed a capital with which the association was to commence business. This capital, with its accumulations, was referred to in the by-laws as the "reserve fund." This capital or "reserve fund" was to be augmented from time to time by having carried to its credit all profits of the association which should exist after paying to the prepaid and permanent shareholders the guaranteed six per cent. and crediting the prepaid permanent and installment shares, respectively, with not to exceed four per cent. to mature them. The expenses of the association were also to be paid from this "reserve fund." Thus the general scheme of the owners of the "founders' stock" was to enter into an enterprise with a paid-in capital in the hope of profit accruing to their shares through the business to be transacted, and the business to be transacted consisted of conducting a business along the lines of ordinary building and loan association operations, including the idea of customers becoming members and known as common stockholders. If these common stockholders were general creditors and not trammeled with the idea that they were in name, at least, members and stockholders, their right to priority of payment would be entirely clear. It seems manifest, however, when the equities arising from the relation between the two classes of stockholders are considered, that the mere fact of membership cannot change the rights arising from those equities. The founders invited the common shareholders to invest their funds in a scheme designated to guarantee to them certain fixed returns. The founders were to profit by such gains as arose from the business over and above the fixed obligations. These conditions operate to create a clear equity of priority of payment in behalf of the common stockholders as well after as before insolvency. As between the founder stockholders and the common stockholders the latter are, in effect, general creditors. Every contract entered into by a trading corporation includes an implied agreement that the company's capital shall be held and used as a trust fund, equitably pledged as security for the corporate debts; and the general scheme of this association, as between its founder shareholders and common shareholders, creates the same equities in behalf of the latter as against the former.

The sixth paragraph of the charter, above quoted, clearly provides for the participation of the founder shareholders' stock only after the common stockholders shall have been paid. The language of the seventh paragraph of the charter, above quoted, to the effect that the "founders' stock" shall not be deemed a liability except at the time and upon a dissolution of the business of the association, is urged to be the equivalent of a declaration that it shall at that time be deemed a liability. Such is its plain meaning; and such meaning is entirely consistent with the views here entertained. Capital stock of a corporation is always a liability in a restricted sense; it becomes an active liability at dissolution, but is then postponed in its payment to all claims having either legal or equitable priority.

In reaching these conclusions I am not unmindful of the underlying principles of co-operation, equality and mutuality upon which building and loan associations usually exist, nor of the tendency of courts to declare against preferential contracts in the affairs of such association. The present case presents to my mind equities in favor of the common shareholders which I cannot disregard. The decision of the receiver is sustained, and distribution is directed in accordance with this opinion.